1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   AARON HARGROVE,

11            Petitioner,                No. CIV S-03-1141 RRB JFM P

12        vs.

13   C. K. PLILER, Warden,

14            Respondent.           FINDINGS & RECOMMENDATIONS

15   _____/

16            Petitioner is a state prisoner proceeding through counsel with an application for a

17   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1999 conviction on

18   charges of first-degree murder with use of a firearm, knowing participation in a street gang, and

19   being an ex-felon in possession of a weapon, as well as true findings on several special

20   allegations.  Petitioner claims that his constitutional rights were violated by the prosecution's

21   improper use of peremptory challenges to exclude black persons from the jury (Batson claim), by

22   improper jury instructions, and by the state court of appeals' improper use of a witness'

23   testimony in its disposition of a claim raised by petitioner on direct appeal.  Upon careful

24   consideration of the record and the applicable law, the undersigned will recommend that

25   petitioner's application for habeas corpus relief be granted on portions of petitioner's Batson

26   claim and denied in all other respects.

1

1

PROCEDURAL AND FACTUAL BACKGROUND[1]

2

A jury convicted [petitioner] Aaron Christopher Hargrove of first-
degree murder, street terrorism, possession of a firearm by a
convicted felon, and associated enhancements.  He was sentenced
to a total determinate term of 13 year 8 months, plus a consecutive
indeterminate term of 25 years to life.[2]

3

4

5

* * *

6

The victim, Kenneth Williams, lived with his fiancee and three
children, his fiancee's five sisters and their children, the fiancé of
one of the sisters, his fiancee's mother, and a family friend in a
home near an apartment complex in Stockton.  At approximately
3:00 a.m., September 13, 1997, Ricky Cobbs, a member of a street
gang known as the East Coast Crips, appeared at the house,
intoxicated.  He claimed he was looking for his gun, and began
ransacking the house to find it.  Cobbs accused Williams of
stealing his gun, but Williams denied doing so.

7

8

9

10

11

Some of the occupants convinced Cobbs to go outside to look in
the car, and then locked him out of the house.  Cobbs responded by
kicking the door and throwing objects off the porch.  He left before
the police arrived.

12

13

14

Later that morning, Cobbs met with a number of other gang
members, perhaps as many as nine or ten including [petitioner],
and complained about Williams taking his gun.  The group
eventually left in four cars and drove to the apartment complex
near Williams's home.  There, they encountered James "Scratch"
Hopkins and asked if he knew of Cobbs's gun.  Hopkins became
scared and retrieved a gun for himself, a semiautomatic "Mac 11."
This angered [petitioner], who opened a gun case and showed
Hopkins he was armed with the same kind of weapon.  Another
man in the group was also armed.  [Petitioner] accused Hopkins of
possessing Cobbs's gun.  When Hopkins continued to deny having
the gun, the group members asked him to show them where
Williams lived.

15

16

17

18

19

20

Arriving at Williams's house at approximately 12:30 p.m., Cobbs
led a portion of the group inside and found Williams.  Cobbs
grabbed Williams in a headlock, and Williams fell to the floor.
The others beat and kicked Williams, who tried to cover his face.

21

22

23

24

25

26

---

[1] This statement of facts is taken from the February 19, 2002, opinion by the California
Court of Appeal for the Third Appellate District (hereinafter Opinion), at pgs. 2-4, appended as
Exhibit A to Respondent's Answer.

[2] The trial court imposed but stayed a one-year enhancement pursuant to Penal Code
section 12022, subdivision (a)(1).  This term is not reflected in the abstract of judgment.

1

2

3

4

5

> Cobbs demanded Williams give him his gun, but Williams
> screamed he did not have it.  As the group stopped beating
> Williams and turned to leave, [petitioner] entered the room,
> pointing a gun at Williams on the floor.  One of the gang members
> stepped in front of [petitioner] and told him not to do it.
> [Petitioner] lowered his gun momentarily, but then stepped over
> Williams, raised the gun again and shot Williams in the chest.
> Authorities at a nearby hospital pronounced Williams dead at 1:13
> p.m. that afternoon.

6

7

(People v. Hargrove, slip op. at 2-4.)

ANALYSIS

8

I.  Standards for a Writ of Habeas Corpus

9

10

Federal habeas corpus relief is not available for any claim decided on the merits in

state court proceedings unless the state court's adjudication of the claim:

11

12

13

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or

14

> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the
> State court proceeding.

15

16

28 U.S.C. § 2254(d).

17

Under section 2254(d)(1), a state court decision is "contrary to" clearly

established United States Supreme Court precedents "if it 'applies a rule that contradicts the

18

19

governing law set forth in [Supreme Court] cases', or if it 'confronts a set of facts that are

20

materially indistinguishable from a decision'" of the  Supreme Court and nevertheless arrives at

21

different result.  Early v. Packer, 573 U.S. 3, 8 (2002) (quoting Williams v. Taylor, 529 U.S. 362,

405-406 (2000)).

22

23

Under the  "unreasonable application" clause of section 2254(d)(1), a federal

habeas court may grant the writ if the state court identifies the correct governing legal principle

24

25

from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

26

1  simply because that court concludes in its independent judgment that the relevant state-court

2  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

3  application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75

4  (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

5  question, is left with a 'firm conviction' that the state court was 'erroneous.'")

6          The court looks to the last reasoned state court decision as the basis for the state

7  court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court

8  reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

9  habeas court independently reviews the record to determine whether habeas corpus relief is

10  available under section 2254(d).  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

11  II.  Petitioner's Claims

12          A.  Prosecutor's Exercise of Peremptory Challenges

13          Petitioner claims that his conviction must be reversed because the prosecutor

14  exercised peremptory challenges to strike three jurors on the basis of race, in violation of Batson

15  v. Kentucky, 476 U.S. 79 (1986).[3]  Petitioner argues that, in evaluating bias in jury selection, the

16  trial court must consider all relevant circumstances, including a comparison of the characteristics

17  of prospective jurors who were stricken by the prosecutor with the characteristics of prospective

18  jurors who were not so stricken.  Because neither the trial court nor the appellate court engaged

19  in such a comparative analysis, petitioner contends that the state courts' denial of his Batson

20  claim is not entitled to the deference required by AEDPA.  Petitioner also argues that the trial

21  /////

22

23          [3]  In the caption to this claim, petitioner argues that the prosecutor improperly exercised
    peremptory challenges to strike two prospective jurors.  (Memorandum of Points and Authorities
24  in Support of Petition (P&A) at 8.)  However, the body of petitioner's argument makes clear that
    he is actually challenging the prosecutor's exercise of peremptory challenges as to three
25  prospective jurors.  At the March 15, 2007, hearing on petitioner's motion for summary
    judgment, petitioner's counsel clarified that he was making a Batson claim with respect to three
26  jurors and explained that the reference to two jurors in the caption was simply a typographical
    error.  Accordingly, the court will address petitioner's Batson challenge as to all three jurors.

1  court used the wrong legal standard when it erroneously found he had not stated a prima facie

2  case of discrimination with respect to one of the jurors.

3       1. <u>Background</u>

4       The state court record reflects that the prosecutor exercised his first peremptory

5  challenge to excuse juror Weeks, No. 180282085 (hereinafter J1), a black woman.  (Augmented

6  Reporter's Transcript on Appeal (ART) at 132.)  After excusing a non-black juror, the prosecutor

7  exercised his third peremptory challenge to excuse juror Wright, No. 180296275 (hereinafter J2),

8  another black woman.  (Id. at 133, 134.)  After passing twice and excusing four other non-black

9  jurors, the prosecutor exercised his eighth peremptory challenge to excuse juror Smith, No.

10 180158512 (hereinafter J3), a third black woman and the last African-American potential juror in

11 the jury pool.  (Id. at 134, 212, 213, 279.)

12       About three-quarters of the way through jury selection, and after the prosecutor

13 had eliminated all African-American jurors from the jury pool, petitioner's counsel made a

14 Batson, motion, challenging the prosecutor's removal of J1.  (Reporter's Transcript on Appeal

15 (RT) at 70.)[4]  The following colloquy then occurred:

16            MR. MARKS (Petitioner's counsel):  Ms. Weeks presented both
             sure as well as answers that were favorable to the prosecution,
17           more so than some of the other people that he excused.  She is
             black.  Two blacks.  I think there are no more blacks on the panel.
18           I don't want to stare at them.  I could be wrong.  There are only
             two on the panel.  And as a matter of fact, Ms. King (sic) is a
19           church going person who is friendly with the matron of the home
             in which this shooting took place.  I can think of no better
20           prosecution witness.  The only adverse problem to the district
             attorney is that the lady is black.  I respectfully say, based on her
21           questionnaire, and that he dismissed her and the fact she is black

22

23       [4]  Petitioner's counsel challenged the peremptory strike pursuant to People v. Wheeler, 22
    Cal.3d 258 (1978), which prohibits, under the California Constitution, the use of racially
24  motivated peremptory challenges.  Id. at 276-77.  A Wheeler motion serves as an implicit
    objection under Batson.  People v. Yeoman, 31 Cal.4th 93, 117 (2003).  Accordingly, petitioner
25  preserved his federal constitutional claim.  This court will refer to counsel's objection as a Batson
    motion.

26

1   and based on the questions that she responded to all parties, the answer to the questions, this is a Wheeler violation.

2
3   I think we made at least a prima facia case to which the District Attorney must respond.

4   THE COURT: Okay.  Let me make a note here.  As to Ms. Weeks, at this juncture, if I find a prima fascia case, I will ask you for your comments.  I will not find a prima fascia case.  She was here and I find she had some difficulty with the law.  While she was a young black lady, I will not find there is a prima fascia case.  Out of fairness, I have seen three ladies among the 18, young black ladies.  One is Ms. Wright.  And then Ms. Smith, whom you are acquainted with.  A former clerk.  I don't like to lead with my chin.

5
6
7
8   By the same token, all hand-on the table, your motion as to Ms. Weeks, is there a motion you have as to Ms. Wright, Della Wright?  The D.A. excused her, a young black lady, a little older in age.

9
10
11  MR. MARKS: I am candid with the Court.  I didn't perceive her as black.  I didn't perceive her as black.  I would say the same applies to her.  It is double.  As much as that is the second out of three blacks.  We have one more to go.

12
13  THE COURT: Fair enough.  As to her, I will find a prima fascia case and let the D.A. state his comments here with that witness and not as to Ms. Weeks.  Did you have thoughts or comments as to her?

14
15
16  MR. FREITAS (the prosecutor): The Court is well aware, we began jury selection last Thursday when questionnaires were passed out.  I would imagine Ms. Weeks and Ms. Wright were both in a panel and I was not there.  But we had some limited contact with the jury at that time.  Questionnaires were passed out and no mention was raised as to the jurors in any way, shape or form on the questionnaire.  I evaluated the questionnaires over the weekend and evaluated them without any idea as to the race of the individuals.  Both Ms. Weeks and Ms. Wright were scored very lowly on my scales for faults.  I observed in the questionnaires and came to the decision to exclude them based on the questionnaires.

17
18
19
20
21
22  THE COURT: Can you be more specific as to Ms. Wright?

23  MR. FREITAS: Absolutely.  Question number 39, was a victim of domestic violence, which, as the Court is well aware of, has many implications with regard to that.  She also told the Court her husband was charged with domestic violence, 273.5, and is currently pending driving under the influence case.  He was asking for a defense attorney.  Based upon those factors, it appeared that a peremptory challenge should be used because of her associations with the criminal justice system and the husband's associations

24
25
26

6

1    specifically as a defendant.  For that reason alone, we used a
     peremptory challenge.

2
     THE COURT: any comments?

3
     MR. MARKS: Yes, Your Honor.  Number 1, "you know how bad
4    domestic violence people are," it doesn't fly well with me.  If there
     is something that is a proven fact, the district attorney should recite
5    it.  I will point out to the Court, in chambers Ms. Wright dealt with
     that, hey, the guy is facing his responsibility, dealt with it head on.
6    Didn't intimate she is mad at the D.A. and is probably happy with
     the D.A., although nobody asked her that, for probably helping her
7    cure what was a family problem.

8    THE COURT: One last comment and then we have to move along.

9    MR. FREITAS: It may not make it grounds to excuse her for cause,
     but it clearly is for peremptory.  Her husband's domestic violence
10   upon her and her husband had a DUI.  For that reason alone.

11   THE COURT: I don't know.  At this time, I am going to find the
     D.A. exercised a valid challenge against her.  Bona fide reasons
12   stated here.  That the DA's reasons are not manufactured.  No
     sham reasons.  I will find their challenge is valid and not part of an
13   improper effort to exclude a particular group of individuals here
     based on a bias.

14

15   (RT at 70-73.)  The trial court then adjourned for the day.  The next morning, petitioner's counsel

16   raised an objection to the prosecutor's peremptory challenge to the third and final African -

17   American juror (J3).  The following exchange then took place:

18   THE COURT: Mr. Marks, you had indicated you had an objection
     to make with regard to the D.A.'s excusing Miss (redacted), who is
19   number eight, a lady who worked for the courts.  Let me note one
     thing.  The reasons I didn't do this out there, I didn't want to do it
20   in front of the jurors.  Two, the remedy is not to take it out on Miss
     (redacted).  The remedy is to discharge the whole panel.  There is
21   no prejudice by waiting and bringing everyone in there.

22   With that in mind, we'll let you state your comments.

23   MR. MARKS: This indeed is a Wheeler motion.  Before I get too
     deeply involved, we've got two other blacks of the jurors that have
24   been dismissed to which an objection was made based on People
     versus Wheeler.

25
     THE COURT: Miss (redacted) and Miss (redacted).  I'm not going
26   to readdress those.

                                     7

MR. MARKS: I wasn't asking you to, but as part of the pattern I want the Court to take judicial notice, I looked around. Now, maybe if I put my glasses on so I could see more than five feet ahead of me, I could see there were blacks on the panel. There were only three blacks on the panel. All three have been discharged.

As I looked at Miss (redacted)'s, you know, document and what she filled in, she has a brother that is a policeman. It's a relative. I could be wrong. She has a little brother who's a policeman. She has also worked in the court system. Obviously, she would have some familiarity with the system that does not include defense attorneys. I just don't feel there's any basic reason why the district attorney would excuse her other than the fact that she's black. So how is she different from anybody else?

THE COURT: We'll note that I'm not going to reopen the matters of Miss (redacted) --

MR. MARKS: I wasn't asking you to.

THE COURT: I'm just making a note here. I'm not going to reopen the matters of Miss (redacted) and Miss (redacted) other than to note that they were young black ladies. Their matters were handled. That brings us to Miss (redacted), probably a lady in her early thirties, a black lady who did work for the courts. Her questionnaire is part of the record. Her responses speak for themselves.

I'm going to find a prima facie case at this point, and I'll ask him to shed some light as to the specific basis for his challenge.

MR. FREITAS: Your Honor, again, as I noted yesterday, I read these questionnaires without any knowledge of the individuals' race. There was no opportunity for us to in fact become aware of the individuals' race at the time of the questionnaires based on the circumstances that I stated yesterday. With Miss (redacted), she received the lowest score. I also indicated that she be challenged for cause based upon her responses in the questionnaire.

On question number 36 she did not put an answer. "Do you believe police officers are more truthful, less truthful or the same compared to other witnesses?" There was no response to that question in the questionnaire. It seems like it's a pretty self-explanatory type of question that numerous jurors had in fact answered throughout these proceedings.

She also indicated that in regard to gang evidence, question number 50, "There may be evidence that some of the persons involved in this case were involved with criminal street gangs.

8

Would that make it impossible for you to weigh the rest of the evidence fairly." She indicated, "Not sure." The first trial referred to allegations that the victim in the case had in fact gang membership. This also weighed heavily in my decision.

Also, there was no answer on the questionnaire to question numbers 63 and 64. Question number 63 discusses that the liability for principals includes aiders and abettors, and 64 says that aiders and abettors are also liable for reasonably foreseeable crimes. There were no answers to those questions.

I was especially concerned, considering that this individual had worked in the courts for some period of time and had exposure to these types of laws, these types of circumstances and was not able to understand these fairly self-explanatory type of statements and these types of questions and could not answer these questions.

In addition, she didn't answer number 66, that the defendant has a right to testify if he so chooses, and his testimony must be weighed the same as any other witness. Again, based upon her experience with the courts, I could not understand how someone could be working in the courts and could not understand that principle.

I seriously questioned how an individual not understanding these three principles would be able to understand jury instructions which are more complicated and use those in reaching a verdict in this case.

Also, question number 73, the question stated, "You must follow the court's instructions on the law. Will you do that even if they are different from what you thought the law was?" There was no answer in the box. She could have checked yes or no. She answered, "Not sure."

Well, clearly, if someone indicates that they are not sure whether or not they can follow the law if it's different than what they believe that it is, they're clearly a candidate for peremptory challenge, and based upon those responses the People made their challenge in the case.

As the Court may also note for the record, we've used, I believe, approximately nine challenges at this point.

THE COURT: Just for the record, you're on your ninth. Ninth is the next, and the defense has used 11.

MR. MARKS: And I've used five challenges thus far on individuals that have no racial significance to these proceedings.

/////

1      THE COURT: Fair enough.  Bud, any comments?

2      MR. MARKS: Well, I've heard a lot of arguments against
3      Wheeler.  This is the worse I've ever heard.  What he's telling us,
       he's justifying his decisions.

4      THE COURT: That's what he's required to do.

5      MR. MARKS: Let me explain my position before you say I'm
       wrong, Judge, then tell me I'm wrong.

6

7      THE COURT: I'm not saying you're wrong.  I'm saying that's
       what he's supposed to do.

8      MR. MARKS: I'm trying to use the vehicle that we have.  The
       vehicle he had was her failure to answer a couple of questions,
9      questions that he didn't bother to go into which obviously shows
       he predetermined them at the time.  He didn't ask her those
10     questions to clarify.  He already knew he was going to kick her off,
       and he didn't want to take any chances of being incorrect.  That's
11     the only answer anybody would have.

12     He was free to say, well, hey, you didn't answer this question.
       How do you feel about that?  Hey, you're not sure about this.  How
13     do you feel about that?  And he's done it with everybody.  He's
       discussed the burden of proof.  He's discussed the aiding and
14     abetting with everybody, but here he didn't want to get involved in
       that.

15

16     It shows a deliberate attempt to be able to squeeze by, especially
       after excusing the two people that he did, and I just think it's a total
17     subterfuge, your Honor.  Now we're faced with the fact that there
       are absolutely no blacks on the jury.

18     THE COURT: Any response?

19     MR. FREITAS: Your Honor, we decided to use the peremptory
       challenge after I read her questionnaire and gave her a low score.
20     We did ask her questions on aiding and abetting.  We did ask her
       questions on her lack of answers to see if we could use the
21     challenge for cause on her.

22     She did not in fact – whether she can rehabilitate herself does not
       deter from the fact that, as Mr. Marks pointed out on another juror,
23     that she filled this out under penalty of perjury and signed under
       oath after being sworn in by the Court.

24

25     She indicates to question 73, for example, that she's not sure
       whether or not she could follow the judge's instructions on the law
       even if they are different from what she thought the law would be.
26     She never rehabilitated herself on those problem grounds.

THE COURT: You don't feel she rehabilitated herself?

MR. FREITAS: Even if she had rehabilitated herself, we're still not bound by those answers. If we may not use a challenge for cause, we could surely use a peremptory challenge based on her responses.

MR. MARKS: The subject of attitude of the prosecutor in rating a person is not a justification to avoid Wheeler. What you have to do is to deal with the thing objectively once we know her race, so I don't agree.

THE COURT: Fair enough. I know you both don't agree. Peremptory challenges are a significant part of the case.

With regard to Miss (redacted) here, she was a young black lady. The D.A. has raised about five or six areas here where, in his mind, it was cause for concern to have her stay.

I'm going to allow their challenge at this juncture over the defense's objection here, and I'll note that although Miss (redacted), forgive me, is a black lady, it would not appear to me, at this juncture, that the D.A. has exercised their challenge per his belief, namely to exclude a specific group of people.

(Id. at 76-82.)

## 2. State Court Opinion

On direct appeal, petitioner argued that the trial court erred when it denied his motion for a new jury venire. The California Court of Appeal denied petitioner's Batson claim with the following reasoning:

[Petitioner] asks us to review the trial court's determination by comparing the qualifications and voir dire answers of the challenged jurors with other jurors not challenged. We decline the invitation. Our Supreme Court has instructed us to "'review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges "with great restraint."' (People v. Ervin (2000) 22 Cal.4th 48, 74.) The trial court's determination is a factual one, and as long as ""'the trial court makes a "sincere and reasoned effort" to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal"'" when they are supported by substantial evidence. (Id. at pp. 75, 76.)" (People v. Catlin (2001) 26 Cal.4th 81, 117.) "We reject, as we have in the past, defendant's contention that we should compare the responses of jurors who were excused with the responses of those who were not excused in

analyzing whether the trial court's reasoned effort to evaluate the prosecutor's claims satisfied <u>Wheeler</u> and <u>Batson</u>.  (<u>People v. Ervin</u>, <u>supra</u>, 22 Cal.4th at p. 76; <u>People v. Jones</u>, <u>supra</u>, 15 Cal.4th at p. 162.)" (<u>Id.</u> at p. 119, fn. 5.)

[Petitioner's] motion attacked three of the prosecution's peremptory challenges: prospective jurors J1, J2, and J3. Regarding J1, the trial court determined [petitioner] had not established a prima facie case of racial discrimination.  The court noted J1 "had some difficulty with the law."  Evidence in the record supports the trial court's determination.

Regarding J2, the court determined [petitioner] had established a prima facie case.  The prosecutor explained he excused J2 because of her past association with the criminal justice system through her husband.  Her husband had been charged with committing acts of domestic violence against J2 and also had a charge of driving under the influence then pending against him.

The trial court determined the prosecution's peremptory challenge against J2 was valid because the prosecution's reasons were bona fide and not manufactured or sham.  The record supports the trial court's determination on this point.

Regarding J3, the court again determined [petitioner] had established a prima facie case.  The prosecutor explained he was concerned J3, a former court employee, failed to answer a number of questions on the juror questionnaire about which a court employee should not be unfamiliar.  To a question whether she could weigh evidence fairly knowing some of the persons involved in this case were involved with criminal street gangs, J3 wrote, "Not sure."  Also, to a question asking if she would follow the court's instructions on the law even if they were different than what she thought the law to be, J3 responded, "Not sure."  The prosecution argued if a potential juror indicated she was not sure if she could follow the law as instructed, that juror was a candidate for at least peremptory challenge.

The trial court overruled the [petitioner's] objections to this challenge.  It did not appear to the court the prosecution had exercised a peremptory challenge against J3 on the basis of her race.

With both J2 and J3, the prosecution's reasons were supported by substantial evidence in the record and were not implausible or discriminatory.  As a result, the trial court was under no obligation to question the prosecutor further or make detailed findings.  The trial court thus made the "sincere and reasoned" effort required to evaluate the nondiscriminatory justifications offered.  Its

/////

conclusions, supported as they are by substantial evidence, are
entitled to receive our deference on appeal.

(Opinion at 18-20.)

### 3.  Federal Legal Standards

Purposeful discrimination on the basis of race or gender in the exercise of peremptory challenges violates the Equal Protection Clause of the United States Constitution. Batson, 476 U.S. at 89; Johnson v. California, 545 U.S. 162 (2005).  So-called Batson claims are evaluated pursuant to a three-step test:

> First, the movant must make a prima facie showing that the prosecution has engaged in the discriminary use of a peremptory challenge by demonstrating that the circumstances raise "an inference that the prosecutor used [the challenge] to exclude veniremen from the petit jury on account of their race." [Citation omitted.]  Second, if the trial court determines a prima facie case has been established, the burden shifts to the prosecution to articulate a [gender]-neutral explanation for challenging the juror in question.  [Citation omitted.]  Third, if the prosecution provides such an explanation, the trial court must then rule whether the movant has carried his or her burden of proving the existence of purposeful discrimination.

Tolbert v. Gomez, 190 F.3d 985, 987-88 (9th Cir. 1999) (en banc).  The burden of persuasion regarding discriminatory motivation "rests with, and never shifts from, the opponent of the strike.'" Yee v. Duncan, 463 F.3d 893, 898 (9th Cir. 2006) (quoting Purkett v. Elem, 514 U.S. 765, 768 (1995)).

This court will evaluate petitioner's Batson claim as to all three jurors with reference to the standards set forth above.

### 4.  Analysis

#### a.  Documents Pertaining to Petitioner's Batson Claim

On November 7, 2003, respondent filed his answer and lodged, among other things, an Augmented Reporter's Transcript on Appeal, which contained the transcript of jury selection in this case.  However, the transcript was not complete; it terminated prior to the

13

1  selection of the entire jury and was missing the voir dire of eight seated jurors and four alternate

2  jurors.  Accordingly, by order dated October 31, 2006, this court ordered respondent to lodge the

3  missing portion of the transcript, "to reflect the entire record of jury voir dire."  After numerous

4  attempts to locate the missing transcript, respondent informed the court that the transcript could

5  not be found or recreated.

6          On February 5, 2007, petitioner filed a motion for summary judgment, arguing

7  that judgment should be granted with respect to his <u>Batson</u> claim "based upon the State's

8  admitted and unjustifiable failure to provide a Constitutionally adequate record" for review of

9  that claim.  (Motion for Summary Judgment (MSJ) at 1.)  Alternatively, petitioner requested that

10  the court grant his <u>Batson</u> claim on the merits, relying on the existing record.  (<u>Id.</u> at 8.)  After a

11  thorough review of the record, this court concludes that the lodged records are sufficient to

12  enable the court to undertake meaningful, adequate and effective review of petitioner's <u>Batson</u>

13  claim.  <u>See</u> <u>Paulino v. Castro</u>, 371 F.3d 1083, 1091 (9th Cir. 2004) (court decided petitioner's

14  <u>Batson</u> claim based on the "mere sliver of state record" provided to the court).[5]

15          For the reasons explained below, the court recommends that petitioner's

16  application for a writ of habeas corpus be granted on his <u>Batson</u> claim with respect to jurors J1

17  and J2 and denied with respect to juror J3.  In light of this recommended disposition of the

18  habeas petition, the court recommends that petitioner's motion for summary judgment be denied.

19                    b.  <u>Standard of Review</u>

20          Petitioner argues that the decision of the California Court of Appeal rejecting his

21  <u>Batson</u> claim with respect to J1 is "contrary to" federal law because the appellate court used an

22  incorrect legal standard in determining whether he had established a prima facie case.  (P&A at

23

24          [5]  Any prejudice resulting from the failure to maintain a complete record of voir dire must
    be borne by respondent.  <u>See</u> <u>Draper v. Washington</u>, 372 U.S. 487, 496-99 (1963) (federal due

25  process requires that the State provide an indigent defendant with a sufficient portion of the
    record to enable him to present his claims to an appellate court); Rule 5 of the Rules Governing §
    2254 Cases (respondent must attach to the answer those portions of the record that are relevant to

26  the issues raised in the petition).

11-12.)  Accordingly, petitioner argues, the court must evaluate this portion of his Batson claim de novo.  (Id.)  Respondent concedes that the state appellate court utilized the wrong standard in rejecting petitioner's Batson claim as to J1 and agrees that this portion of the claim should be reviewed de novo.  (Answer at 19.)  Accordingly, this court will analyze petitioner's Batson claim with respect to J1 de novo.  Paulino, 371 F.3d at 1090 (federal court of appeals examined Batson claim de novo because the state court used the wrong legal standard when analyzing whether defendant made a prima facie showing of bias); Wade v. Terhune, 202 F.3d 1190, 1195 (9th Cir. 2000) (holding that when the state court uses the wrong legal standard, the rule of deference required by 28 U.S.C. § 2254(d)(1) does not apply).

Petitioner also argues that the decision of the California Court of Appeal with respect to all three jurors was contrary to federal law because the state appellate court refused to consider comparative evidence in the record in its analysis of petitioner's Batson claim.  (See Opinion at 18.)  In Boyd v. Newland, 467 F.3d 1139, 1150 (9th Cir. 2006), cert. denied 127 S.Ct. 2249 (2007), the United States Court of Appeals for the Ninth Circuit held that "under the clearly established Supreme Court precedent of Batson, comparative juror analysis is an important tool that courts should utilize on appeal when assessing a defendant's plausible Batson claim."  In reaching this decision, the court in Boyd assumed without deciding that a comparative juror analysis should be undertaken even in circumstances where the trial court ruled that the defendant failed to make a prima facie showing at the first step of the Batson analysis.  Id. at 1149.  The court also stated that the threshold for establishing a prima facie Batson claim is "quite low."  Id. at 1145.

This court agrees with petitioner that the state court's failure to conduct a comparative analysis of seated jurors with excused jurors in conducting its analysis of petitioner's Batson claim is contrary to federal law.  See Boyd, 467 F.3d at 1149; Kesser v. Cambra, 465 F.3d 351, 358 (9th Cir. 2006) ("We hold that the California courts, by failing to consider comparative evidence in the record before it that undeniably contradicted the

15

1   prosecutor's purported motivations, unreasonably accepted his nonracial motives as genuine").

2   Because the California Court of Appeal employed the incorrect legal standards in determining

3   whether petitioner had established a prima facie case with respect to J1 and in failing to conduct

4   a comparative analysis of the seated jurors with the excused jurors, this court will examine

5   petitioner's Batson claim with respect to all three jurors de novo.  See Panetti v. Quarterman ___

6   S.Ct. ___, 2007 WL 1836653 at *16 (when a state court's adjudication of a claim "is dependent

7   on an antecedent unreasonable application of federal law," a federal court must "resolve the

8   claim without the deference AEDPA otherwise requires").

9   c.   <u>Juror J1</u>

10      Petitioner first argues that the trial court erred in finding that he failed to

11   demonstrate a prima facie case of racial discrimination with respect to J1.

12      In order to establish a prima facie case of racial discrimination, petitioner must

13   show that "(1) the prospective juror is a member of a "cognizable racial group," (2) the

14   prosecutor used a peremptory strike to remove the juror, and (3) the totality of the circumstances

15   raises an inference that the strike was motived by race."  Boyd, 467 F.3d at 1143 (citing Batson,

16   476 U.S. at 96 and Cooperwood v. Cambra, 245 F.3d 1042, 1045-46 (9th Cir. 2001)).  A prima

17   facie case of discrimination "can be made out by offering a wide variety of evidence, so long as

18   the sum of the proffered facts 'gives rise to an inference of discriminatory purpose.'"  Johnson,

19   545 U.S. at 168 (quoting Batson, 476 U.S. at 93-94.)  "The defendant is entitled to rely on the

20   fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection

21   practice that permits 'those to discriminate who are of a mind to discriminate.'"  Id. at 169

22   (quoting Avery v. Georgia, 345 U.S. 559, 562 (1953).  In considering the merits of petitioner's

23   claim with regard to J1, this court must consider the "totality of the relevant facts" and "all

24   relevant circumstances" surrounding the prosecutor's use of a peremptory strike as to this juror,

25   Batson, 476 U.S. at 94, 96, and must analyze the context in which the peremptory strike arose.

26   /////

1    Johnson, 545 U.S. at 173.  See also Boyd, 467 F.3d at 1146-47.  However, "a defendant can

2    make a prima facie showing based on statistical disparities alone."  Paulino, 371 F.3d at 1091.

3           The first and second elements of the test for determining whether a prima facie

4    case has been made are met in this case because J1 is African-American and the prosecutor used

5    a peremptory challenge to remove her.  The issue presented is whether the trial court erred in

6    failing to find an inference that the strike of J1 was motivated by race.

7           In Johnson v. California, the United States Supreme Court discussed the level of

8    proof necessary to establish a prima facie case under Batson.[6]  545 U.S. at 168.  In Johnson, as in

9    this case, the prosecutor used three of his peremptory challenges to eliminate the only African-

10   American prospective jurors from the jury pool.  Id. at 164.  The defense raised a Batson

11   challenge after the second and third strikes against black jurors.  Id.  The trial judge ruled after

12   each challenge that the defense had not established a prima facie case of racial bias, concluding

13   from his own observations that the prosecutor's strikes could be justified by race-neutral reasons.

14   The Supreme Court reversed, explaining that:

15              We did not intend the first step to be so onerous that a defendant
                would have to persuade the judge – on the basis of all the facts,
16              some of which are impossible for the defendant to know with
                certainty – that the challenge was more likely than not the product
17              of purposeful discrimination.  Instead, a defendant satisfies the
                requirements of Batson's first step by producing evidence
18              sufficient to permit the trial judge to draw an inference that
                discrimination has occurred.

19

20   Id. at 170.  In Johnson, the court concluded that two "inferences of discrimination" present in that

21   case were sufficient to establish a prima facie case under Batson: the fact that the trial judge

22   /////

23   /////

24   _____

25       [6]  In Batson, the Supreme Court held that because the petitioner had timely objected to the
     prosecutor's striking of "all black persons on the venire," the trial court erred when it "flatly
     rejected the objection without requiring the prosecutor to give an explanation for his action."  Id.,
26   476 U.S. at 100.

1    pronounced the issue "very close," and the fact that "all three African-American prospective

2    jurors were removed from the jury." 545 U.S. at 173.[7]

3           In this case, as in Johnson, the prosecutor excused all three African-American

4    prospective jurors from the jury.  "Happenstance is unlikely to produce this disparity." Miller-El,

5    545 U.S. at 241 (prosecutor used peremptory strikes to exclude 91% of eligible African-

6    American jurors).  This court concludes that this statistical disparity gives rise to an inference of

7    racial bias in jury selection with respect to J1.  See Williams, 432 F.3d at 1107 (defendant

8    established an inference of racial discrimination under Batson based on statistical analysis alone,

9    where defendant was African-American, the prosecutor used three of his first four peremptory

10   challenges to remove African-Americans from the jury panel and only four of the first forty-nine

11   potential jurors were African-American); Paulino, 371 F.3d at 1091 (inference of bias where

12   prosecutor used five out of six peremptory challenges to strike African-Americans; case

13   remanded for prosecution to provide race-neutral reasons for the exclusion of these jurors);

14   Fernandez v. Roe, 286 F.3d 1073, 1077-80 (9th Cir. 2002) (inference of bias where four out of

15   seven Hispanics and two blacks were excused by the prosecutor); Turner v. Marshall, 63 F.3d

16   807, 812 (9th Cir. 1995) (overruled on other grounds by Tolbert v. Page, 182 F.3d 677, 681 (9th

17   Cir. 1999) (en banc), (prima facie showing where prosecutor challenged five out of a possible

18   nine African-American jurors).  However, the court will consider whether any other relevant

19   circumstances refute this inference.  See Williams, 432 F.3d at 1107 (when reviewing a Batson

20   claim, a court should continue to consider "any other relevant circumstances" brought to its

21

22          [7] In Miller-El v. Dretke, 545 U.S. 231 (2005), the Supreme Court conducted a
     comparative analysis of seated jurors with excused jurors to determine whether the prosecutor's
23   stated reasons for excusing an African-American juror were pretextual (the third stage of the
     Batson analysis).  Respondent argues that Johnson and Miller-El may not be retroactively applied
24   to this case.  (Answer at 19.)  However, in Boyd, the Ninth Circuit Court of Appeals rejected the
     state's argument that Miller-El was not retroactive, concluding that Johnson and Miller-El merely
25   clarified Batson and did not establish any new rules of criminal procedure.  467 F.3d at 1145-46.
     See also Williams v. Runnels, 432 F.3d 1102, 1105 n.5 (9th Cir. 2006) (reaching same
26   conclusion).  In light of these decisions, this court rejects respondent's argument in this regard
     and will consider the holdings of Johnson and Miller-El in deciding petitioner's Batson claim.

attention that may support or refute an inference of discriminatory purpose, including an inference from statistical disparity).

One relevant circumstance is a comparative juror analysis.  Boyd, 467 F.3d at 1145.  See also Kesser, 465 F.3d at 360 (the "totality of the relevant facts" includes "the characteristics of people [the prosecutor] did not challenge.").  "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination . . . Miller-El, 545 U.S. at 241.[8]

>    The oral voir dire of Juror J1 was as follows:
>
>    THE COURT:  Now 180282085, if I might start with you and proceed through the other five people here.  I read through your questionnaire.  Didn't have a lot of questions here.  A couple of things to keep in mind.  There are issues or allegations of gangs in this case.  Knowing that do you think you would be a fair person in this case?
>
>    PROSPECTIVE JUROR 180282085: (Indicated with affirmative nod.)
>
>    THE COURT: Is that yes?
>
>    PROSPECTIVE JUROR 180282085: (Indicated with affirmative not.)
>
>    THE COURT: Any concerns you have about your ability to be fair?
>
>    PROSPECTIVE JUROR 180282085: No.
>
>    THE COURT: I am not picking on you.  It has only happened twice.  A juror suddenly comes in and said after two weeks, I thought I could be fair and now I can't be fair.  It has happened twice.  You can be a fair person, right?
>
>    PROSPECTIVE JUROR 180282085: Yes.

---

[8]  Respondent argues that this court should not conduct a comparative analysis because petitioner's counsel did not present comparative analysis evidence before the trial court. (Answer at 19.)  The court rejects this argument.  See Miller-El, 545 U.S. at 241 n.2 (making clear that comparative analysis is required even when it was not requested or attempted in the state court); Kesser, 465 F.3d at 361 (same).

1    THE COURT: We want you to judge the case based on the
     evidence here in court and not on anything else.  Can you do that?
2
     PROSPECTIVE JURLR 180282085: Yes.
3
     THE COURT: Anything else you wanted to mention about being a
4    juror on the case?

5    PROSPECTIVE JUROR 180282085: Yes.  One of the witnesses I
     know of her.
6
     THE COURT: Who is that?  I didn't pick that up in reading this.
7    Did you mark the person's name?

8    PROSPECTIVE JUROR 180282085: No, no.

9    THE COURT: Do you remember who that person was?

10   PROSPECTIVE JUROR 180282085: Yes.  Carriel King.

11   THE COURT: He has got them alphabetically.  Let's go down
     here.  There are a number of Kings listed.  Is that person going to
12   testify here?

13   MR. FREITAS: Yes, she will.

14   THE COURT: How well do you know that person?

15   PROSPECTIVE JUROR 180282085: I just know her.  I went to
     church with her.  She stood up and how they have to introduce
16   themselves.

17   THE COURT: Is that the extent of your acquaintanceship with her?

18   PROSPECTIVE JUROR 180282085: Yes.

19   THE COURT: Is she a friend?

20   PROSPECTIVE JUROR 180282085: Just somebody I seen at
     church.
21
     THE COURT: Do you think the fact you know her name and that
22   she goes to church, does she still go to church with you?

23   PROSPECTIVE JUROR 180282085: That was a couple of years
     ago.  I see her every once in a while on the bus.
24
     THE COURT: If she comes in and testifies, and it sounds like she
25   is going to, will that put you in a difficult spot in the case?

26   PROSPECTIVE JUROR 180282085: No.

1      THE COURT: Hey, that is Carriel.  I will believe her or not believe
       her.
2
       PROSPECTIVE JUROR 180282085: No.
3
       THE COURT: Do you know anything about her to influence how
4      you feel about her?

5      PROSPECTIVE JUROR 180282085: No.

6      THE COURT: In a nutshell, can you treat her the same as any other
       witness?
7
       PROSPECTIVE JUROR 180282085: Yes.
8
       THE COURT: You would be able to believe her or disbelieve her
9      depending on how you saw her?

10     PROSPECTIVE JUROR 180282085: Yes.

11     THE COURT: Anybody else you know or know of on this list?

12     PROSPECTIVE JUROR 180282085: No.

13     THE COURT: Any other concerns or difficulties?

14     PROSPECTIVE JUROR 180282085: No.

15     THE COURT: Fine, thank you, ma'am.

16  (ART at 56-59.)

17         When it was his turn to ask voir dire questions, petitioner's counsel asked juror J1

18  about her relationship with witness Carriel King.  (Id. at 71-72.)  The juror confirmed that she

19  could evaluate Ms. King's testimony "like everybody else's."  (Id. at 72.)  She stated that she was

20  willing to follow the law pursuant to the judge's instructions even if she disagreed with the

21  instructions.  (Id. at 72-73.)

22         Subsequently, the prosecutor asked Juror J1 whether she recognized the name

23  "SMG, South Mob Gangsters."  (Id. at 96.)  The juror stated that she was familiar with the name

24  because of "high school, peers.  People that went to school with me."  (Id.)  She stated that she

25  had seen gang graffiti but that no-one had ever told her they were a member of a gang.  (Id. at 97-

26  98.)  The following colloquy then occurred:

21

MR. FREITAS:  One of your concerns was that a lot of the questions were about guns and you found some guns obviously cause a lot of violence and create life-threatening situations.  Is that a correct paraphrasing of what you put down?

PROSPECTIVE JUROR 180282085: What was the question?

MR. FREITAS: Concerned about guns because if a person was violent they could a create (sic) life-threatening situation.  Is that a fair statement of your belief about guns and gun laws?

PROSPECTIVE JUROR 180282085: I can't remember exactly about what the question was.  It was something about, could you read it?  Do you know what I am talking about?

THE COURT: I will let him go ahead.  He has specific ideas.  Do you have clarification?

MR. FREITAS: Do you agree in certain people's hands guns are very violent and people shouldn't have them?

PROSPECTIVE JUROR 180282085: Yes.

MR. FREITAS: We had a couple of questions about a person being liable for not only their crimes but crimes they aided and abetted.  You had a question mark.

PROSPECTIVE JUROR 180282085: I didn't understand it.

MR. FREITAS: Not only liable for the crimes they committed but crimes which are reasonably foreseeable.

PROSPECTIVE JUROR 180282085: Those are two questions I didn't understand.  I just put a question mark by them.

MR. FREITAS:  Thank you very much.

(Id. at 98-99.)

Although the trial court declined to find a prima facie case of discrimination and did not require the prosecutor to explain his reason for striking J1, the prosecutor nevertheless volunteered the information that before jury voir dire even began, he "came to the decision to exclude (J1 and J2) based on the questionnaires."  (RT at 72.)  He stated that both jurors "scored very lowly on my scales for faults."  (Id.).  On voir dire, the prosecutor asked J1 about: (1) her knowledge of street gangs; (2) whether she believed certain people should not have guns; and (3)

22

her confusion about the law of aiding and abetting and foreseeable circumstances.  Juror J1 stated

that certain people she went to school with were members of a gang; she believed that guns could

be dangerous in the hands of certain people; and she stated she was confused about the questions

regarding aiding and abetting liability.  The prosecutor did not probe the extent of J1's confusion

about the law.

A comparison of J1's answers to the prosecutor's questions and the answers of

other jurors to the jury questionnaire on these same topics is instructive.  Seated juror "one"

agreed that certain persons should not possess firearms and was familiar with firearms.  (Clerk's

Transcript on Augmentation, lodged September 1, 2006 (hereinafter CTA), at 7).  Seated juror

"two" agreed that certain persons should not possess firearms, was familiar with firearms, had

seen gang related movies, and believed some of the people he worked with had gang ties.  (Id. at

20, 21).  Seated juror "three" agreed that certain persons should not possess firearms, had seen

gang related movies, and had heard of several gangs.  (Id. at 33-34).  Seated juror "six" agreed

that certain persons should not possess firearms, had seen gang related movies, had heard of

certain gangs, and would not follow the law regarding aiders and abettors and reasonable

foreseeability "in some circumstances."  (Id. at 72, 73, 75).  Seated juror "eight" agreed that

certain persons should not possess firearms and was familiar with firearms, answered both "yes"

and "no" to the question whether he agreed with the laws on aiding abetting, and did not answer

the question whether he would follow this law if instructed to do so by the judge.  (Id. at 98,

101).  Seated juror "nine" agreed that certain persons should not possess firearms and had seen

gang related movies.  (Id. at 111, 112).  Seated juror "ten" agreed that certain persons should not

possess firearms, had heard of gangs. and had been told that her neighborhood had "quite a few

gangs congregating in that area." (Id. at 124, 125). Seated juror "twelve" stated that he could

follow the law regarding aiders and abettors and reasonable foreseeability only "if they witness

the crime."  (Id. at 153).  Seated juror "thirteen" had a "22 semi auto rifle."  (Id. at 163).  An

alternate juror had seen gang related movies and answered both "yes" and "no" when asked

1  whether he agreed with the law concerning aiders and abettors and reasonable foreseeability.  (Id.

2  at 190, 192).  Another alternate juror had seen gang related movies, had heard of gangs, and had

3  gang problems in his neighborhood.  (Id. at 203).

4  A review of the questionnaires of seated jurors therefore reflects that a number of

5  jurors who served were, like J1, apparently confused about the law of aiding and abetting and

6  foreseeability, were familiar with gangs, and believed that some persons should not have guns.

7  The fact that the prosecutor excused J1 for these same reasons but kept the above-described

8  jurors on the jury raises an inference of discrimination.

9  As described above, the trial judge declined to find a prima facie case with respect

10  to J1 because of his observation that "she had some difficulty with the law." (RT at 71.)  The

11  state appellate court upheld the trial court's decision in this regard, finding that "evidence in the

12  record supports the trial court's determination." (Opinion at 19.)  However, reliance on the trial

13  judge's speculation as to a possible non-discriminatory reason for the exclusion of J1 is contrary

14  to the Supreme Court's admonition in Johnson that when determining whether a prima facie case

15  has been established, a trial judge should not "engag[e] in needless and imperfect speculation

16  [about the prosecutor's reasons for excluding a juror] when a direct answer can be obtained by

17  asking a simple question." 545 U.S. at 172.  On the contrary, a reviewing court should not

18  consider whether there are race neutral reasons for excluding a juror unless the analysis has

19  reached step three of the Wheeler/Batson framework.  Williams, 432 F.3d at 1107-1108 ("If the

20  (prosecutor's) stated reason does not hold up, its pretextual significance does not fade because a

21  trial judge, or an appeals court, can imagine a reason that might not have been shown up as

22  false"); Paulino, 371 F.3d at 1089 -1090 (disapproving the actions of the trial court in "offer[ing],

23  sua sponte, its speculation as to why the prosecutor may have struck the five potential jurors in

24  question").

25  This court also notes that the prosecutor did not attempt to explain the law

26  concerning aiding and abetting liability to J1 when she said she was confused about it.  When J1

stated she didn't answer the questions on the juror questionnaire because she didn't understand

them, he simply said "thank you very much" and terminated the questioning.  As the Supreme

Court stated in Miller-El, "we expect the prosecutor would have cleared up any

misunderstanding by asking further questions before getting to the point of exercising a strike."

545 U.S. at 244.  See also United States v. Esparza-Gonzalez, 422 F.3d 897, 905 (9th Cir. 2005)

(the fact that prosecutor waived any questioning of the jurors provided support for an inference

of intentional discrimination); Fernandez v. Roe, 286 F.3d 1073, 1079 (9th Cir. 2002) (relying

partly on the fact that the "prosecutor failed to engage in meaningful questioning of any of the

minority jurors" to establish a prima facie case).

When petitioner's counsel raised a Batson objection to the prosecutor's dismissal

of J1, he argued that the circumstances gave rise to an inference of discrimination.  He pointed

out that J1 was a "church going person who is friendly with the matron of the home in which the

shooting took place" and argued that, for this reason, she would have been an ideal juror from the

prosecution standpoint.  He argued that her answers to voir dire questions and her personal

circumstances were more favorable to the prosecution than "some of the other people that he

excused."  Counsel noted that all of the African Americans had been eliminated from the panel.

After a review of the entire record, this court finds that the inferences that discrimination may

have occurred in the decision to strike J1 were sufficient to establish a prima facie case under

Batson.  Put another way, petitioner has met his burden to show that "the totality of the relevant

facts gives rise to an inference of discriminatory purpose."  Batson, 476 U.S. at 93-94.

Because the trial court found that defendant had not made out a prima facie case,

it did not move on to steps two and three of the Batson analysis.  The federal courts generally

remand for further hearings in this situation, to determine whether the prosecutor had a valid

reason for striking a minority juror.  See Johnson, 545 U.S. at 173; Paulino, 371 F.3d at 1092.

However, because this court recommends that petitioner's Batson claim be granted with respect

to the striking of J2, the court will recommend that petitioner receive a new trial.

1                    d. Jurors J2 and J3

2          As described above, the trial court found a prima facie case with respect to the

3   striking of J2 and J3 and required the prosecutor to explain his reasons for challenging these

4   jurors.  Petitioner argues that a comparison of the seated and excused jurors at his trial reflects

5   that the prosecutor's stated reasons for striking Jurors J2 and J3 were pretextual.  Accordingly,

6   this court will evaluate whether the prosecutor's reasons for excluding J2 and J3 pass

7   constitutional muster.[9]

8          "In evaluating the race neutrality of an attorney's explanation, a court must

9   determine whether, assuming the proffered reasons for the peremptory challenges are true, the

10  challenges violate the Equal Protection Clause as a matter of law."  Hernandez, 500 U.S. at 359.

11  At the second step of the Batson analysis, "'the issue is the facial validity of the prosecutor's

12  explanation.  "A neutral explanation in the context of our analysis here means an explanation

13  based on something other than the race of the juror."  Id. at 360.  "Unless a discriminatory intent

14  is inherent in the prosecutor's explanation, the reason offered will be deemed race-neutral."

15  Stubbs v. Gomez, 189 F.3d 1099, 1105 (9th Cir. 1999) (quoting Hernandez, 500 U.S. at 360).

16  For purposes of step two, the prosecutor's explanation need not be "persuasive, or even

17  plausible."  Purkett, 514 U.S. at 768.  Indeed, "to accept a prosecutor's stated nonracial reasons,

18  the court need not agree with them."  Kesser, 465 F.3d at 359.  "It is not until the *third* step that

19  the persuasiveness of the justification becomes relevant--the step in which the trial court

20  determines whether the opponent of the strike has carried his burden of proving purposeful

21  discrimination."  Purkett, 514 U.S. 765, 768 (1995) (emphasis in original).  The question is

22  /////

23

24          [9]  Because the prosecutor was required to come forward with a race-neutral explanation
    for the challenges to J2 and J3 and the trial court ruled on the ultimate question of intentional
25  discrimination, the preliminary issue of whether the petitioner made a prima facie showing with
    respect to these jurors is moot.  Hernandez v. New York, 500 U.S. 352, 359 (1991); United
26  States v. Murillo, 288 F.3d 1126, 1135-36 (9th Cir. 2002).

                                        26

1  whether, after an evaluation of the record pertaining to that particular case, the prosecutor's race-

2  neutral explanation for a peremptory challenge should be believed.  Id.

3         This court finds that the prosecutor's stated reasons for exercising peremptory

4  challenges as to both J2 and J3 were race-neutral.  The prosecutor explained that he exercised a

5  peremptory challenge against J2 because her husband had been charged with committing acts of

6  domestic violence and driving under the influence.  The prosecutor explained that he exercised a

7  peremptory challenge against J3, a former court employee, because she failed to answer a number

8  of questions on the juror questionnaire about topics with which a court employee should be

9  familiar.  These reasons were facially race-neutral.  It was therefore incumbent on the trial court

10  to employ the third step of the Batson analysis to determine whether the prosecutor's race-neutral

11  explanations were sincere or whether they were a pretext for deliberate discrimination.  Kesser,

12  465 F.3d at 359.

13         In the third step of a Batson challenge, the trial court has "the duty to determine

14  whether the defendant has established purposeful discrimination," Batson, 476 U.S. at 98, and, to

15  that end, must evaluate the "persuasiveness" of the prosecutor's proffered reasons.  See Purkett,

16  514 U.S. at 768.  In determining whether petitioner has carried this burden, the Supreme Court

17  has stated that "a court must undertake 'a sensitive inquiry into such circumstantial and direct

18  evidence of intent as may be available.'"  Batson, 476 U.S. at 93 (quoting Arlington Heights v.

19  Metro. Hous. Dev. Corp., 429 U.S. 252, 266 (1977)); see also Hernandez, 500 U.S. at 363.

20  "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for

21  purposeful discrimination."  Purkett, 514 U.S. at 768.  See also Lewis v. Lewis, 321 F.3d 824,

22  830 (9th Cir. 2003) ("[I]f a review of the record undermines the prosecutor's stated reasons, or

23  many of the proffered reasons, the reasons may be deemed a pretext for racial discrimination.")

24  In step three, the court "considers all the evidence to determine whether the actual reason for the

25  strike violated the defendant's equal protection rights." Yee, 463 F.3d at 899. "A court need not

26  /////

1 find all nonracial reasons pretextual in order to find racial discrimination." <u>Kesser</u>, 465 F.3d at

2 360.

3              i. <u>Juror J2</u>

4          During oral voir dire, J2 stated that she understood that "the defendant is

5 presumed innocent." (ART at 17.) The court noted that J2 had indicated on the juror

6 questionnaire that she had a "family member in the past who has some type of legal difficulty."

7 (<u>Id.</u> at 18.) J2 stated that this would not influence her in this case. (<u>Id.</u>) In a private discussion

8 in chambers, J2 informed the court that she had been struck by her husband, but they were now

9 "together" and were "fine." (<u>Id.</u> at 45.) The following colloquy then occurred:

10          THE COURT: Did he get prosecuted for that in court?

11          PROSPECTIVE JUROR 180296275: Uh-huh.

12          THE COURT: Did you have to come to court on that?

13          PROSPECTIVE JUROR 180296275: No.

14          THE COURT: Did you talk to the DA's office about that? Did
         they call you up and --
15
         PROSPECTIVE JUROR 180296275: No. He said no contest. We
16          will just go.

17          THE COURT: How long ago was that, ma'am?

18          PROSPECTIVE JUROR 180296275: Two years.

19          THE COURT: Does that experience leave you with certain feelings
         about coming to court or being a juror?
20
         PROSPECTIVE JUROR 180296275: No, no.
21
         THE COURT: Is that problem behind you and your husband?
22
         PROSPECTIVE JUROR 180296275: It's been behind me. I can't
23          answer for him at all.

24          THE COURT: Is there anything at all that you think might make it
         hard for you to be a juror. You were mad at the D.A., I didn't want
25          it to go that far. Upset with your husband. Geez, you know, it
         wouldn't be right being a juror in this case.
26

1  PROSPECTIVE JUROR 180296275: No.  I don't have a problem with that.  I wasn't sure of the question I circled.

2

3  THE COURT: I appreciate that.  Everybody has experiences in their life.  In this case, the defendant is not required to prove he is innocent.  Do you understand that?

4

5  PROSPECTIVE JUROR 180296275: Yes.

6  THE COURT: If somebody doesn't come to court – okay, you are here.  Hey, look, put on evidence.  Show me something.  He doesn't have to do that.  The D.A. files charges against people.  Leave Mr. Hargrove out of it.  They have to prove the case.  They have to prove it beyond a reasonable doubt.  Do you think you would be a fair juror to everybody?

7

8

9  PROSPECTIVE JUROR 180296275: Yes.

10  THE COURT: Not pre-judge the case?

11  PROSPECTIVE JUROR 180296275: Right.

12  THE COURT: We will not bring this thing up.  And this isn't going to be read back by somebody or read in court.  This is private stuff.  Same as the other folks.  Any questions either of you have for 180296275 here?

13

14

15  MR. FREITAS (the prosecutor): Your husband is currently pending court proceedings for a DUI?

16  PROSPECTIVE JUROR 180296275: Yes.

17   MR. FREITAS: Does he have an attorney at this point?

18  PROSPECTIVE JUROR 180296275: I believe he is going to ask for a public defender.

19

20  MR. FREITAS: Does he have feelings about whether it is a good case, bad case?

21  PROSPECTIVE JUROR 180296275: No.  He said he was drunk.  He knows the rules.  He knows what he is going up against.

22

23  MR. FREITAS: He is going to ask for an attorney and investigate his options?

24  PROSPECTIVE JUROR 180296275: Yes.  He is in the building today.

25

26  THE COURT: Were you there or a witness?

1    PROSPECTIVE JUROR 180296275: No.  I don't go that far.

2    THE COURT: Can you leave that case outside of this case?

3    PROSPECTIVE JUROR 180296275: Definitely.  I am not
     involved now.

4

5    (Id. at 45-47.)[10]

6         The prosecutor used his third peremptory challenge to excuse J2.  (Id. at 134.)

7    The prosecutor explained that he did so because she was the victim of domestic violence

8    perpetrated by her husband, and because her husband was charged with domestic violence and

9    had a pending criminal case for driving under the influence.  (RT at 72.)  The prosecutor said he

10   excused her, essentially, because "of her associations with the criminal justice system and the

11   husband's associations specifically as a defendant."  (Id.)  He stated, "for that reason alone, we

12   used a peremptory challenge."  (Id.)  The trial court found these reasons were not "manufactured"

13   or a "sham," and were "valid and not part of an improper effort to exclude a particular group of

14   individuals here based on a bias."  (Id. at 73.)

15        A review of the record reflects, however, that a number of jurors who served on

16   petitioner's jury had themselves been arrested for driving under the influence, were married to

17   someone who had been arrested for driving under the influence, or had a friend who had received

18   a DUI arrest.  Specifically, the wife of juror No. 5 had been arrested for a DUI (CTA at 57);

19   jurors No. 3, 8, and 9 had been arrested for DUI themselves (id. at 31); the brother and friend of

20   juror No. 6 had been arrested for "being drunk" (id. at 70); one alternate juror had been arrested

21   /////

22

23   [10]  At another point in the transcript of jury voir dire, the record reflects that the
     prosecutor asked several questions of juror No. 180296275.  (Id. at 105.)  It appears to the court
     that this is a typographical error and that the juror set forth on ART 105 is a different juror than
24   J1.  In addition, the record reflects that the defense excused a juror with the number 180296275
     after the prosecutor had already excused juror No. 180296275.  (See id. at 134, 176, 328.)  It
25   appears to the undersigned that the court reporter has mistakenly supplied the same number to
     two different jurors.  This court will therefore assume that the number assigned to the other juror
26   was simply a typographical error or misstatement.

1    for DUI (id. at 161); and another alternate juror had a friend who was arrested for DUI (id. at

2    174.)

3              Other jurors also had "associations with the criminal justice system."

4    Specifically, the son of juror No. 2 had been detained for racing (id. at 18); the cousin of juror

5    No. 4 was arrested for drug related offenses (id. at 44); juror No. 6 was arrested for "fighting"

6    (id. at 70); and an alternate juror answered in the affirmative to the question whether "you or any

7    family member or close friend [had] ever been the victim of any crime;" specifically stating

8    "molest of children." (Id. at 201.)  Other jurors had been the victims of crime, as was J2.

9    Specifically, jurors No. 2, 3, 4, 5 and 10 and one of the alternate jurors were the victims of

10   property crimes.  (CTA at 19, 32, 45, 58, 123, 175.)

11             As described above, the prosecutor stated that one of the reasons he challenged J2

12   was that she "was a victim of domestic violence, which, as the Court is well aware of, has many

13   implications with regard to that."  (RT at 72.)  This reason is not plausible and cannot pass as a

14   reasoned explanation for excusing a potential juror.  The record of this case does not reveal any

15   reason why a person who has been the victim of domestic violence in the past could not be a

16   satisfactory juror.  That is especially true here, where J2 stated that the incident had been

17   resolved long ago.  The fact that "one or more of a prosecutor's justifications do not hold up

18   under judicial scrutiny militates against the sufficiency of a valid reason." McClain v. Prunty,

19   217 F.3d 1209, 1221 (9th Cir. 2000). See also United States v. Chinchilla, 874 F.2d 695, 699

20   (9th Cir.1989) (stating that, although reasons given by prosecutor "would normally be adequately

21   'neutral' explanations taken at face value, the fact that two of the four proffered reasons do not

22   hold up under judicial scrutiny militates against their sufficiency").  In any event, a significant

23   majority of the seated jurors had experienced some "association with the criminal justice

24   system," including as a "defendant" and as a "victim."  The fact that the other jurors' contact

25   with the justice system did not arise from domestic violence is a distinction without a difference;

26   J2's experience with the criminal justice system was comparable to that of other panel members

1  not struck by the prosecutor.  As stated by the Supreme Court, a "per se rule that a defendant

2  cannot win a <u>Batson</u> claim unless there is an exactly identical white juror would leave <u>Batson</u>

3  inoperable; potential jurors are not products of a set of cookie cutters." <u>Miller-El</u>, 545 U.S. at

4  247 n.6.

5            During voir dire, J2 stated unequivocally and apparently without hesitation that

6  her husband's DUI and prior arrest for domestic violence would not impact her duties as a juror

7  or her ability to be fair.  These facts, coupled with the circumstance that the prosecutor's first and

8  third peremptory challenges eliminated two out of the three African-Americans on the jury panel,

9  and the fact that the prosecutor ultimately excused all of the black potential jurors from the jury

10 panel, indicates that the prosecutor's stated reasons for excluding J2 were a pretext for

11 eliminating her from the jury on account of her race.  This constitutes a violation of <u>Batson</u>.

12           A prosecutor's motives may be revealed as pretextual where a given explanation is

13 equally applicable to a juror of a different race who was not stricken by the exercise of a

14 peremptory challenge.  <u>See Caldwell v. Maloney</u>, 159 F.3d 639, 651 (1st Cir.1998).  "Peremptory

15 challenges cannot be lawfully exercised against potential jurors of one race unless potential

16 jurors of another race with comparable characteristics are also challenged." <u>McClain</u>,  217 F.3d

17 at 1220 -21.  As explained above, the prosecutor justified his peremptory strike against J2

18 because of her association with the criminal justice system through her husband, who had been

19 arrested for a DUI and domestic violence.  Yet the prosecutor failed to exercise a peremptory

20 strike against the other jurors, described above, who had equal or even more personal association

21 with the criminal justice system.  A comparison between J2 and these other jurors fatally

22 undermines the credibility of the prosecutor's stated justification for excusing J2 and

23 demonstrates that J2's association with the criminal justice system could not have genuinely

24 motivated the prosecutor to strike her.  <u>See Chinchilla</u>, 874 F.2d at 695 (holding that an appellate

25 court may overturn the finding of the trial court where a comparison between the answers given

26 by prospective jurors who were struck and those who were not fatally undermines the

prosecutor's credibility).  If the prosecutor's reasons were genuine and not merely pretextual, he would have excluded the other jurors on the same basis, which he did not.

For the foregoing reasons, this court finds that the prosecutor's stated reasons for excusing juror J2 were a pretext for discrimination.  Accordingly, petitioner's <u>Batson</u> challenge should be upheld with respect to the prosecutor's exercise of a peremptory challenge with respect to J2.

ii.  <u>Juror J3</u>

Petitioner also raises a <u>Batson</u> challenge with respect to J3.  During oral voir dire of Juror J3, the following colloquy took place:

> THE COURT: 180158512, first you work for the court and now seated for the jury?
>
> PROSPECTIVE JUROR 180158512: Okay.
>
> THE COURT: You work with the people in the past.
>
> PROSPECTIVE JUROR 180158512: Somewhat.
>
> THE COURT: Anything you know that could help you decide in the case or are they like lawyers you dealt with in the past?
>
> PROSPECTIVE JUROR 180158512: That is it.  I don't know the list.  If I see the people, I may know them.
>
> THE COURT: That is always the problem we have.  There are a list of potential witnesses, I am not guaranteeing they will be called.  It is apparent to me they will not all be called.  Not all of them.
>
> Are you able to sit in judgment of the facts of the case?  It is not a death penalty case.  You are not going to be asked to decide the case on penalty, prejudice, or anything like that.  Leave it out of the case.  You are here to decide the facts of the case.  Do you think you can?
>
> PROSPECTIVE JUROR 180158512: Yes.
>
> THE COURT: You have a family, brother up in Seattle in law enforcement?
>
> PROSPECTIVE JUROR 180158512: Yes.

1    THE COURT: Can you treat the officers by the same standard?

2    PROSPECTIVE JUROR 180158512: Sure.

3    THE COURT: One item, and again some of this is repetitive.  The
     district attorney has the burden of proof.  You have to follow the
4    law.  Any problems with that?

5    PROSPECTIVE JUROR 180158512: No.

6    THE COURT: Any other difficulties or problems in serving as a
     juror?
7
     PROSPECTIVE JUROR 180158512: No.
8

9    (ART at 22-23.)

10           When questioned by petitioner's counsel, juror J3 stated that she could be fair to

11   both sides and that her religious convictions would not prevent her from making a fair decision.

12   (Id. at 87.)  When questioned by the prosecutor, the following colloquy occurred:

13    MR. FREITAS: 180158512, there were several questions you
      didn't answer, especially the law questions; is that correct?
14
      PROSPECTIVE JUROR 180158512: I don't remember.  What was
15    the question?

16    MR. FREITAS: There were about four of them.  Three in a row.
      Again, about the aiding and abetting and crimes which are
17    reasonably foreseeable and the defendant not testifying.

18    PROSPECTIVE JUROR 180158512: I really didn't understand it.
      You said the scenario as far as a person in the car driving and being
19    aware of what is going on in there.  If he wasn't aware, hey.  You
      justified that.  He would have to be some of that, too.
20
      MR. FREITAS: You found that you didn't like the gang movies
21    but you were also unsure if the gang allegations were in fact proven
      in this case you could be fair; is that correct?  You said you didn't
22    like the gang movies.  If there were gang allegations in this case,
      you would not be sure if you could be fair?
23
      PROSPECTIVE JUROR 180158512: I have got too many families
24    all over the place.  That is where my decision was based on.  Is that
      what the question asked?
25
                                    * * *
26

                                    34

1           My thing with that one, it was all over the page with it.  Family
        members, friends, people in different gangs and colors and all of
2           that.  No.  I got family all over Stockton.  I think I specified that.  I
        just wouldn't want to be in nothing like that.  I would bow out of it,
3           you know what I mean, as to my duty or whatever you guys want to
        call it.  I would have nothing to say on it.  I wouldn't.
4
        MR. FREITAS: Is it a fair statement you would prefer not to sit in
5           judgment on the case because of your family members all over
        Stockton?
6
        PROSPECTIVE JUROR 180158512: Human, I relate to; but
7           family members, no, I wouldn't relate to it.

8           MR. FREITAS: Thank you.

9   (Id. at 108-09.)

10         The prosecutor explained to the trial court that he gave J3 the "lowest score" of all

11  potential jurors based upon her responses to the juror questionnaire.  (RT at 78.)  He explained

12  that J3 did not answer questions 36 (asking whether she believed police officers were more

13  truthful or less truthful than other witnesses); 63 and 64 (asking whether she agreed with the laws

14  on aider and abettor liability); or 66 (asking whether she could decide the case according to the

15  principle that a defendant's testimony must be weighed in the same way as other witnesses).  (Id.

16  at 78-82.)  He further justified his challenge of J3 on the basis that she answered "not sure" to a

17  question asking whether she could follow the court's instructions even if they differed from what

18  she thought the law was; and that she was "not sure" whether she could weigh the evidence fairly

19  even though some of the witnesses were involved in street gangs.  (Id. at 81.)  The prosecutor

20  also explained that he did not believe J3 had "rehabilitated herself" upon individual questioning.

21  (Id.)  The trial court rejected petitioner's challenge to the dismissal of J3 because the prosecutor

22  had "raised five or six areas" or concern and it did not appear to the court that the prosecutor had

23  exercised a peremptory challenge of J3 because of her race.  (Id. at 82.)

24         After a review of the state court record, and a comparison of the jurors stricken

25  with the jurors retained, this court concludes that the prosecutor's reasons for excluding J3 from

26  the jury were not pretextual.  The court notes, first, that the prosecutor accepted the jury several

1  times with J3 as part of the jury.  This is an indication that he was not determined to excuse her

2  simply because she was black.  Further, none of the seated jurors expressed doubt that they

3  would be able to follow the court's instructions if the instructions conflicted with their own

4  beliefs regarding the law, as did J3.  These facts and the prosecutor's stated justification for

5  excusing J3 provide legitimate reasons for the prosecution to exercise its peremptory challenges

6  with respect to this juror.  The prosecutor's contention that J3 did not "rehabilitate herself" on

7  individual questioning also stands up to the record.  The answers given by J3 were not

8  particularly responsive to the prosecutor's questions on voir dire – indeed, they are almost

9  unintelligible.

10         Petitioner has failed to sustain his burden of persuasion with respect to the

11  prosecutor's challenge to J3.  Although the prosecutor retained other jurors who were confused

12  about the law regarding aiders and abettors and although J3 was the last African-American

13  potential juror on the panel, a review of the record, including the voir dire transcript and juror

14  questionnaires, lends support to the prosecutor's position that he exercised his peremptory

15  challenges against J3 based on the reasons stated and not as a pretext for discrimination.  This

16  court finds the reasons set forth by the prosecution to be legitimate and race-neutral reasons for

17  exercising this peremptory challenge.  Accordingly, the trial court did not err in overruling

18  petitioner's <u>Batson</u> objection as to J3.[11]

19         B.  <u>Jury Instruction Error</u>

20         Petitioner raises several claims of jury instruction error.  After setting forth the

21  applicable legal standards, these claims will be evaluated below.

22  /////

23

24  _____
[11]  Although this court concludes that the prosecutor did not strike J3 on account of her
25  race, petitioner is still entitled to prevail on his <u>Batson</u> claim.  The "striking of a single black juror for racial reasons violates the equal protection clause, even though other black jurors are seated, and even when there are valid reasons for the striking of some black jurors."  <u>Turner</u>, 121
26  F.3d at 1255 n.4.

1        1.  <u>Legal Standards</u>

2             In general, a challenge to jury instructions does not state a federal constitutional

3  claim.  <u>See</u> <u>Middleton v. Cupp</u>, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing <u>Engle v. Isaac</u>, 456

4  U.S. 107, 119 (1982)); <u>Gutierrez v. Griggs</u>, 695 F.2d 1195, 1197 (9th Cir. 1983).  In order to

5  warrant federal habeas relief, a challenged jury instruction "cannot be merely 'undesirable,

6  erroneous, or even "universally condemned,"' but must violate some due process right

7  guaranteed by the fourteenth amendment."  <u>Prantil v. California</u>, 843 F.2d 314, 317 (9th Cir.

8  1988) (quoting <u>Cupp v. Naughten</u>, 414 U.S. 141, 146 (1973)).  To prevail on such a claim

9  petitioner must demonstrate "that an erroneous instruction 'so infected the entire trial that the

10  resulting conviction violates due process.'"  <u>Prantil</u>, 843 F.2d at 317 (quoting <u>Darnell v.</u>

11  <u>Swinney</u>, 823 F.2d 299, 301 (9th Cir. 1987)).  In making its determination, this court must

12  evaluate the challenged jury instructions "'in the context of the overall charge to the jury as a

13  component of the entire trial process.'"  <u>Id.</u> (quoting <u>Bashor v. Risley</u>, 730 F.2d 1228, 1239 (9th

14  Cir. 1984)).  Further, in reviewing an allegedly ambiguous instruction, the court "must inquire

15  'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a

16  way' that violates the Constitution."  <u>Estelle v. McGuire</u>, 502 U.S. 62, 72 (1991) (quoting <u>Boyde</u>

17  <u>v. California</u>, 494 U.S. 370, 380 (1990)).  Where, as here, the challenge is a failure to give an

18  instruction, the petitioner's burden is "especially heavy," because "[a]n omission, or an

19  incomplete instruction is less likely to be prejudicial than a misstatement of the law."  <u>Henderson</u>

20  <u>v. Kibbe</u>, 431 U.S. 145, 155 (1977); <u>see also</u> <u>Villafuerte v. Stewart</u>, 111 F.3d 616, 624 (9th Cir.

21  1997).              .

22        2.  <u>Jury Instruction on Claim-of-Right</u>

23             The trial court instructed petitioner's jury on four independent legal theories to

24  support a verdict of first degree murder.  The first three theories were felony murder (in the

25  commission of an attempted robbery); conspiracy to commit robbery resulting in murder; and

26  murder as a natural and probable consequence of the target crime petitioner intended to aid.  The

fourth theory was for willful, deliberate, and premeditated murder.  (Opinion at 4.)  On direct appeal, petitioner argued that the first three theories of prosecution were not legally viable and that his conviction should be reversed because it was not possible to determine on which theory the jury relied in reaching its verdict.  (Id.)  In support of this argument, petitioner cited People v. Guiton, 4 Cal.4th 1116 (1993) and Griffin v. United States, 502 U.S. 46 (1991).  In Guiton, the California Supreme Court held that when one of the theories of liability presented to a jury is legally inadequate, reversal generally is required unless it is possible to determine from other portions of the verdict that the jury necessarily found the defendant guilty on the proper theory.  4 Cal.4th at 1129.  In Griffin, the United States Supreme Court noted the general rule that "where a provision of the Constitution forbids conviction on a particular ground, the constitutional guarantee is violated by a general verdict that may have rested on that ground."  502 U.S. at 53.

Petitioner's defense to the first three theories of liability was that he was merely helping Cobbs reclaim his own property and that neither he nor Cobbs had an intent to steal the gun because it was owned by Cobbs.  Petitioner argued to the trial court that the jury should be instructed on "claim of right" in order to support this defense.  (RT at 777-81.)  Specifically, petitioner claimed that:

> he was entitled to assert the claim-of-right defense on the following grounds: (1) even if [petitioner] mistakenly believed Cobbs was entitled to retrieve his gun, [petitioner] still could claim the defense because he subjectively believed Cobbs was seeking his own gun; and (2) in any event, because Cobbs, as a matter of law, lacked felonious intent in trying to retrieve his own gun, by logic, defendant acting to aid and assist Cobbs also lacked specific intent.

(Opinion at 5-6.)[12]

---

[12]  In People v. Tufunga, 21 Cal.4th 935, 943 (1999), the California Court of Appeal described California's claim-of-right defense as follows:

> "Although an intent to steal may ordinarily be inferred when one person takes the property of another, particularly if he takes it by force, proof of the existence of a state of mind incompatible with an intent to steal precludes a finding of either theft or robbery.  It has long been the rule in this state and generally throughout the

1          The California Court of Appeal rejected these arguments.  The state court noted,

2   first, that California law had not extended the claim-of-right defense to persons other than the

3   actual owner of the disputed property.  (Id. at 6.)  Therefore, in this case, where Cobbs, and not

4   petitioner, was the purported owner of the gun, only Cobbs was theoretically entitled to assert a

5   claim-of-right defense.  The court concluded, "the defense cannot be extended beyond the taker

6   to one who aids and abets the taker . . . although Cobbs may have entered the home to retake his

7   own property, the same cannot be said of [petitioner.]  He had no claim of right to the gun." (Id.

8   at 7.)  In this regard, the state court noted that, as an ex-felon, petitioner did not have a bona fide,

9   good faith belief in a right or claim to the gun.  The court stated, "[petitioner's] counsel admitted

10  at oral argument [petitioner] surely knew he was prohibited from owning or possessing a firearm.

11  /////

12

13                    country that a bona fide belief, even though mistakenly held, that
                      one has a right or claim to the property negates felonious intent.  A
14                    belief that the property taken belongs to the taker, or that he had a
                      right to retake goods sold is sufficient to preclude felonious intent.
15                    Felonious intent exists only if the actor intends to take the property
                      of another without believing in good faith that he has a right or
16                    claim to it."

17  The pertinent jury instruction, CALJIC No. 9.44, provides, in pertinent part, as follows:

18  CALJIC 9.44. Robbery--Theft By Larceny--Defense Of Claim Of Right

19                    An essential element of the crime of [robbery] is a specific intent permanently to
                      deprive the alleged victim of his or her property.  That specific intent does not
20                    exist if the alleged perpetrator had a good faith claim of right to title or ownership
                      of the specific property taken from the alleged victim.  In other words, if a
21                    perpetrator seeks to regain possession of property in which [he] honestly believes
                      [he] has a good faith claim of ownership or title, then [she] does not have the
22                    required criminal intent.

23                                             * * *

24                    If, after a consideration of all the evidence, you have a reasonable doubt that
                      [defendant] possessed the required specific intent, you must find [him] not guilty
25                    of the crime of robbery.

26

                                              39

1   Thus, [petitioner] did not hold a bona fide belief he himself had a right or claim to Cobbs's gun,

2   and thus could not take advantage of the claim-of-right defense." (Id. at 8.)

3          The appellate court also concluded that public policy did not support extending

4   the claim-of-right defense to the situation presented by this case.  The court explained, "were we

5   to hold otherwise, we would be condoning the very behavior which occurred here – a group of

6   nine or ten gang members forcing their way into a home, attempting to rob the victim by brutally

7   beating and kicking the victim, and eventually killing him, and all this based on one of their

8   member's assertion of a belief in his right to certain property allegedly in the victim's

9   possession." (Id. at 7-8.)

10         Petitioner also argued on appeal that he was entitled to a claim-of-right defense

11  because Cobbs was entitled to the defense.  The appellate court rejected this argument on the

12  ground that Cobbs was not entitled to the defense either, because his claim of ownership was

13  founded on a "notoriously illegal transaction."  See Tufunga, 21 Cal.4th at 954, n.5 (availability

14  of claim-of-right defense is limited by policy considerations where the claim to the property is

15  "founded in a 'notoriously illegal' transaction").  The state court explained:

16              The trial court determined Cobbs suffered sustained juvenile
                petition in 1989 when he was 18 years old for willfully and
17              maliciously discharging a firearm.  (See Pen. Code, § 246.)  As a
                result, Penal Code section 12021, subdivision (e), prohibited
18              Cobbs from owning, possessing or having in his custody or control
                any firearm until the age of 30 years.  The court noted Cobbs was
19              either 26 or 27 years old when he committed this crime, and thus
                had no legal right to own or possess a gun at that time.
20
                                        * * *
21
                The very fact Cobbs had possession of a gun sometime before he
22              lost it and sometime near the time he attacked Williams, i.e., at a
                time when it was unlawful for him to possess a gun, rendered the
23              manner in which he came into ownership or possession of the gun
                a notoriously illegal "transaction" or activity.
24

25  (Opinion at 9-10.)

26  /////

Finally, the state appellate court concluded that, even if it was appropriate to extend the claim-of-right defense to aiders and abettors, it should not be extended in this case because there was an adequate basis in the record to determine that the verdict of first degree murder was based on the valid ground of a willful, deliberate, and premeditated murder.  (Id. at 10.)  The court explained:

As part of a negotiated plea which required him to testify truthfully before the jury in this case, accomplice Samuel Grim described the murder to the jury in detail.  A member of the East Coast Crips, Grim participated in Williams's beating.  After the attack concluded, it was Grim who saw [petitioner] first raise his gun, and it was Grim who told [petitioner] not to do it.  Grim saw [petitioner] lower the gun momentarily, then raise the gun again and shoot Williams.

Although Grim's credibility was challenged, Grim's testimony was not contradicted at trial.  The testimony eliminates any question [petitioner] murdered Williams willfully and deliberately.  Regarding proof of premeditation, Grim's testimony showed [petitioner] actually paused to lower his gun.  He then changed his mind and raised the gun again.  As a gang member, [petitioner] obviously was angered by the alleged offense to Cobbs, his fellow gang member – angry enough to bring a gun in violation of law and to use it.  Furthermore, he used the gun when there was no threat to him.  The victim was lying helpless on the floor, the other gang members were in the process of leaving the victim's room, and Grim in fact attempted to stop defendant from using the gun.  The killing was nothing less than an assassination or execution.  Indeed, the jury received instructions only on murder, not manslaughter.

Thus, we have facts demonstrating an apparent planning by [petitioner] to kill Williams and an apparent motive from which the jury could infer reflection and weighing of considerations rather than unconsidered or rash impulse hastily executed.  The facts also demonstrate the manner of killing was so particular [petitioner] must have acted on a preconceived design to kill in a particular way.  These are the types of facts from which a jury can infer premeditation.  (citation omitted.)

* * *

So compelling is Grim's testimony it provides a sound basis for us confidently to conclude the verdict was actually based on the fourth of the prosecution's theories supporting the charge of murder:

1                   [petitioner] killed Williams willfully, deliberately, and with
                  premeditation.

2

3 (Id. at 14-15.)

4          In the instant petition, petitioner argues that the prosecutor's theories that

5 petitioner was guilty of first degree murder because the killing occurred during the commission

6 of a robbery or attempted robbery, or because the killing was the natural and probable

7 consequence of conspiracy to commit robbery "were incorrect because the property petitioner

8 and Ricky Cobbs attempted to reclaim from the victim belonged to Cobbs." (P&A at 14.)

9 Petitioner argues extensively that the California Court of Appeal misinterpreted and misapplied

10 California law when it determined that petitioner was not entitled to a defense of claim-of-right.

11 (Id. at 15-22.)

12          Petitioner's challenge to California's interpretation of its own law is not

13 cognizable in this federal habeas corpus petition.  The United States Supreme Court repeatedly

14 has held that state courts are the ultimate expositors of state law, regardless of the state law at

15 issue.  Mullaney v. Wilbur, 421 U.S. 684, 691 & n.11 (1975).  "It is not the province of a federal

16 habeas court to reexamine state-court determinations on state-law questions."  Estelle, 502 U.S.

17 at 67-68 (1991).  See also Hicks v. Feiock, 485 U.S. 624, 629-30 (1988); Bradshaw v. Richey,

18 126 S.Ct. 602, 604 (2005) ("[A] state court's interpretation of state law, including one announced

19 on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus");

20 Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005) ("Any error in the state court's

21 determination of whether state law allowed for an instruction in this case cannot form the basis

22 for federal habeas relief").  Thus, this court must accept the conclusion of the California Court of

23 Appeal that petitioner was not entitled under state law to a jury instruction on the defense of

24 "claim-of-right."

25          This court also notes that the trial court did not prevent petitioner from arguing to

26 the jury that he lacked the intent to rob.  Petitioner had a fair opportunity to present whatever

evidence he had that would indicate his absence of intent, and he had a fair opportunity to have

the facts in the case argued to the jury.  In other words, petitioner was denied a jury instruction,

not a defense.  <u>Compare</u> <u>Conde</u>, 198 F.3d 734, 741 (9th Cir. 1999) (trial court violated due

process where defendant's proposed defense was supported by law and had some foundation in

the evidence, but the trial court improperly precluded defendant's attorney from making closing

argument explaining the defendant's theory of the case, refused to instruct the jury on the

defendant's theory and, over the defendant's objection, gave erroneous instructions that did not

require that the jury find every element of the offense).

        Petitioner also claims that the absence of a jury instruction on the defense of

"claim of right" omitted the intent element of petitioner's defense.  Even assuming arguendo that

petitioner is correct, any error was harmless under the circumstances of this case.  <u>See</u> <u>Neder v.</u>

<u>United States</u>, 527 U.S. 1, 4 (1999) (state court's error in giving a jury instruction that omitted an

element of the offense subject to harmless error analysis).  For the reasons explained in the

opinion of the California Court of Appeal, the facts of this case demonstrated that petitioner shot

Williams with premeditation and deliberation.  Because the jury reasonably could have

concluded that petitioner was guilty of premeditated murder, any error in failing to instruct on a

"claim-of-right defense" with respect to other theories of liability could not have had a

substantial effect on the ultimate verdict in this case.  <u>See</u> <u>Brecht</u>, 507 U.S. at 637 (on collateral

review, an error is not "harmless" if it "had substantial and injurious effect or influence in

determining the jury's verdict").  <u>See also</u> <u>Fry v. Pliler</u>, ___ U.S. ___, 127 S.Ct. 2321 (2007) (in

habeas proceedings, federal court must assess prejudicial impact of constitutional error under the

<u>Brecht</u> standard).  For these same reasons, the omission of a jury instruction on claim-of-right did

not render petitioner's trial fundamentally unfair, in violation of the due process clause.

Accordingly, for all of the above-described reasons, petitioner is not entitled to relief on this jury

instruction claim.

/////

3.  <u>Instructions on Aider and Abettor Liability and the Natural and Probable Consequences Doctrine</u>

As described above, one of the prosecution's theories of liability was that the victim's murder was a natural and probable consequence of an assault and battery that petitioner aided and abetted.  In support of this theory petitioner's jury was instructed that:

> One who aids and abets another in the commission of a crime or crimes is not only guilty of that crime or those crimes, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime or crimes originally aided and abetted.
>
> In order to find the defendant guilty of the crime of murder, as charged in Count One, you must be satisfied beyond a reasonable doubt that:
>
> 1.  The crime or crimes of assault or battery was or were committed;
>
> 2.  That the defendant aided and abetted that crime or crimes;
>
> 3.  That a co-principal in that crime committed the crime of murder; and
>
> 4.  The crime of murder was a natural and probable consequence of the commission of the crime of assault or battery.
>
> You are not required to unanimously agree as to which originally contemplated crime the defendant aided and abetted, so long as you are satisfied beyond a reasonable doubt and unanimously agree that the defendant aided and abetted the commission of an identified and defined target crime and that the crime of murder was a natural and probable consequence of the commission of that target crime.

(CT) at 216.)  Quoting <u>People v. Prettyman</u>, 14 Cal.3d 248, 267 (1996) and <u>People v. Butts</u>, 236 Cal.App.2d 817, 836 (1965), petitioner argues that this instruction was erroneous "because murder is not a natural and probable consequence of simple assault or simple battery, as a matter of law."  (P&A at 23.)

The California Court of Appeal disagreed with petitioner's argument and his interpretation of California law.  The court concluded that whether a particular criminal act was a natural and probable consequence of another act aided and abetted by a defendant was a factual

question to be resolved in light of all the surrounding circumstances.  (Opinion at 12-13.)  The appellate court explained,

> In Prettyman, the Supreme Court refined and applied the test to determine whether an aider and abettor is guilty of a crime committed by another principal that is more serious than the target crime.  Nowhere did the Supreme Court determine murder cannot as a matter of law be a reasonably foreseeable, or "natural and probable" consequence of assault and battery.
>
> * * *
>
> We can certainly foresee situations such as this where murder is a natural and probable consequence of assault and battery.  Here, a criminal street gang stormed a house.  Two of the gang members, including [petitioner], were carrying firearms.  [Petitioner] had already displayed his firearm to the group moments before they entered the house.  The group members did not commit just a single assault.  Rather, a number of them repeatedly and viciously hit, punched and kicked the helpless victim over a period of minutes.
>
> In light of all of these circumstances, a reasonable person could determine murder was a natural and probable consequence of this particular attack.  We thus conclude the trial court did not err as a matter of law by instructing the jury murder could be a natural and probable consequence of the assault and battery committed against Williams.

(Id. at 12-13.)

The decision of the California Court of Appeal with respect to this claim is not contrary to or an unreasonable application of the federal due process principles set forth above and should not be set aside.  Under the circumstances of this case, a jury instruction informing the jury that petitioner could be found guilty of murder if the murder was the natural and probable consequence of the assault and battery on Williams did not render petitioner's trial fundamentally unfair.  Further, as explained above, any claim that the state appellate court misinterpreted California law is not cognizable in this federal habeas corpus proceeding.  For these reasons, petitioner is not entitled to relief on this claim.

/////

/////

1   C.  Reliance by California Court of Appeal on Assessment of Witness's Credibility

2         As described above, the California Court of Appeal concluded that even if the trial

3   court's jury instructions regarding the first three prosecutorial theories of liability were incorrect,

4   petitioner's conviction should not be reversed because there was a basis in the record to find that

5   the verdict was actually based on the valid theory that Williams' murder was premeditated and

6   deliberate.  In reaching this conclusion, the appellate court found that "so compelling is Grim's

7   testimony it provides a sound basis for us confidently to conclude the verdict was actually based

8   on the fourth of the prosecution's theories supporting the charge of murder: [petitioner] killed

9   Williams willfully, deliberately, and with premeditation."  (Id. at 15.)

10        Petitioner argues that the appellate court's use of its own assessment of Grim's

11  credibility and the weight to be accorded to his testimony as a basis for affirming petitioner's

12  convictions violated state law, the Fourteenth Amendment right to due process, and the Sixth

13  Amendment right to trial by jury.  (P&A at 28.)  Specifically, petitioner argues that he has a

14  liberty interest in: (1) a state court's adherence to applicable state law regarding the appropriate

15  court to decide issues of witness credibility; (2) a due process right to "fundamental fairness in

16  the application of the law to him," including the right to have the law applied in a "non-arbitrary

17  manner;" and (3) a Sixth Amendment right to have the jury, and not an appellate court, decide

18  the credibility of prosecution witnesses.  (Id. at 30.)  Petitioner cites numerous state court

19  authorities for the proposition that an appellate court may not determine the credibility of

20  witnesses.  (Id. at 29-30.)  He argues that "affirmance of his conviction cannot lawfully be based

21  on an appellate determination that Grim's testimony is credible and 'compelling,' under

22  California law."  (Id. at 30.)

23        Petitioner raised this claim for the first time in a petition for review filed in the

24  California Supreme Court.  (Answer, Ex. B.)  That petition was summarily denied.[13]  Under these

25  _____

26  [13]  Justice Kennard was of the opinion that the petition should be granted.  (Id.)  The
    Supreme Court also directed the Reporter of Decisions not to publish the opinion of the

1  circumstances, this court must independently review the record to determine whether habeas

2  corpus relief is available under section 2254(d).  Delgado, 223 F.3d at 982.

3  　　　　　　The California Court of Appeal determined, in essence, that the evidence

4  introduced at trial, including Grim's testimony, demonstrated that petitioner's jury found him

5  guilty on a theory of premeditated murder and not on the other three theories argued by the

6  prosecutor.  In reaching this conclusion, the appellate court accepted Grim's testimony at face

7  value and assumed that it was credible.  Petitioner's argument that this situation violated his right

8  to due process or his right to a jury trial is meritless.  Petitioner's jury assessed the credibility of

9  all of the trial witnesses, including Grim, and found him guilty.  There is no evidence that the

10  appellate court made its own credibility determination, nor could it – Grim was not before the

11  court of appeal.  The appellate court was entitled to rely on the evidence at trial in making its

12  harmless error analysis.  The decision of the state courts rejecting petitioner's claim in this regard

13  is not contrary to or an unreasonable application of United States Supreme Court authority.

14  Accordingly, petitioner is not entitled to relief.

15  　　　　　　For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that:

16  　　　　　　1.  Petitioner's February 5, 2007 motion for summary judgment be denied;

17  　　　　　　2.  Petitioner's application for a writ of habeas corpus be granted based on

18  petitioner's Batson claim with respect to jurors J1 and J2;

19  　　　　　　3.  Respondent be directed to release petitioner from custody unless proceedings

20  in the state court leading to retrial are commenced within sixty days from the date of any order by

21  the district court adopting these findings and recommendations; and

22  　　　　　　4.  In all other respects the petition be denied.

23  　　　　　　These findings and recommendations are submitted to the United States District

24  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

25  _____

26  California Court of Appeal, which had been certified for partial publication.  (Id.)

days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  July 30, 2007.

UNITED STATES MAGISTRATE JUDGE

008:hargrove1141.hc